IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

ASHLEY RENEE LATOSKI, §
§
Plaintiff, §
§
v. § 2:09-CV-0198
§
MICHAEL J. ASTRUE, §
Commissioner of Social Security, §
§
Defendant. §

**REPORT AND RECOMMENDATION**
**TO AFFIRM DECISION OF THE COMMISSIONER**

Plaintiff ASHLEY RENEE LATOSKI brings this cause of action pursuant to 42 U.S.C.

§ 405(g), seeking review of a final decision of defendant MICHAEL J. ASTRUE, Commissioner of

Social Security (Commissioner), denying plaintiff's application for supplemental security income

(SSI) benefits. Both parties have filed briefs in this cause. For the reasons hereinafter expressed,

the undersigned United States Magistrate Judge recommends the Commissioner's decision finding

plaintiff not disabled and not entitled to benefits be AFFIRMED.

I.
PROCEEDINGS

On July 5, 2007,[1] plaintiff filed an application for SSI alleging she had been unable to work

---

[1]Plaintiff, born November 8, 1988, was 18-years-old when she filed her application under the name Ashley Renee Renfroe. (Tr. 58). As of April 7, 2008, plaintiff was married to Floyd Latoski.

because of a disabling condition since July 5, 2007.[2]  (Tr. 58-60).  In a Disability Report dated July 5, 2007, plaintiff alleged she is unable to work due to"mental health" and identified "ADHD, dysthemia, bipolar and Aspergers" as conditions limiting her ability to work.  (Tr. 89-99).  Plaintiff averred her condition had affected her since August 1, 2001 (when she was 6-years-old), but that she had worked after her condition first interfered with her work.  Plaintiff indicated she stopped working June 7, 2007 due to "illness."  Plaintiff noted she completed the 10th grade and attended special education classes, but subsequently obtained her GED.  Plaintiff identified past work as a cashier in the fast food industry, indicating such work was "off and on" with the longest job being held six weeks. (2005-2007).[3]  In a Daily Activity Questionnaire, plaintiff clarified her alleged conditions are behavioral, brought on by frustration, anxiety and racing thoughts, and resulting in withdrawal, blanking out and shutting down.  (Tr. 84-88).  Plaintiff's records from Amarillo Independent School District, Northwest Texas Healthcare System, Texas Tech Health Sciences Center, medical doctors and mental health doctors were made a part of the record.  On December 7, 2007, the Social Security Administration denied plaintiff benefits.[4]  (Tr. 26, 39-43).

On January 15, 2008, plaintiff submitted a Disability Report - Appeal wherein she averred

---

[2]Plaintiff initially alleged August 1, 2001 as her onset date, however, such date was subsequently amended to July 5, 2007, the date she filed her SSI application.  (Tr. 48, 58).

[3]In a Sequential Vocational Guide form completed December 4, 2007, plaintiff's work as a "cashier fast food"was identified as past relevant work, unskilled, and using vocational rule 204.00 as a framework, identified other jobs plaintiff could perform as cleaner/housekeeping, assembler, small products, and addresser.  (Tr. 73).

[4]A state agency identified plaintiff's primary diagnosis as bipolar disorder and secondary diagnosis as learning disorder.  (Tr. 26).  The agency determined plaintiff's condition is not severe enough to keep her from working.  (Tr. 43).  The agency based this determination on the medical and other information, plaintiff's age, education, training and work experience.  The agency noted plaintiff claimed she is disabled because of attention-deficit hyperactivity disorder, dysthymia, bipolar disorder, and Asperger's syndrome.  The agency determined medical reports show plaintiff has some problems with her ability to interact with others, but that her current symptoms were not severe enough to be considered disabling.  The agency noted the evidence did not show any other health problems that cause significant limitations.  The agency noted that although plaintiff said she has various limitations caused by her symptoms, the evidence did not show her ability to perform basic work activities is as limited as she indicated.  The agency concluded plaintiff is unable to return to work she performed in the past, but that her condition allows her to perform other less demanding work.

she began having "uncontrollable black outs" in mid-December 2007.  Plaintiff stated the blackouts

occurred without warning when she encountered "any amount of stress or anxiety."  Plaintiff

explained she was not able to work or drive, encounter crowds or situations that would bring about

stress or anxiety because she would black out.  Plaintiff indicated she was 14 weeks pregnant and

her anxiety had become worse as her anti-depressants and anti-anxiety medications had been

changed or discontinued due to her pregnancy.  Plaintiff also updated her employment history to

include three (3) additional jobs lasting only 2 weeks to 3 months each.  (Tr. 61-72, 74-80).

Plaintiff's representative also submitted additional records from Texas Panhandle MHMR and

Northwest Texas Healthcare System.  On March 13, 2008, the Social Security Administration

denied plaintiff benefits upon reconsideration.[5]  (Tr. 25, 33-36 ).

On May 1, 2008, plaintiff, represented by counsel, requested a hearing before an

Administrative Law Judge (ALJ).  (Tr. 27-29, 37-38).  An administrative hearing was held before

an ALJ on October 9, 2008.  (Tr. 19-23).  Plaintiff, represented by counsel, appeared and testified at

the hearing as did a vocational expert (VE).

On March 25, 2009, the ALJ rendered an unfavorable decision, finding plaintiff not disabled

and not under a disability as defined by the Social Security Act at any time through the date of his

decision.  (Tr. 5-15).  The ALJ stated he considered the complete medical history, consistent with

20 C.F.R. § 416.912(d), in making his decision.  (Tr. 8).  "After careful consideration of the entire

record," the ALJ found plaintiff had not engaged in substantial gainful activity since June 13, 2007,

---

[5]Upon reconsideration, a state agency identified plaintiff's primary diagnosis as major depression disorder, and found the
medical evidence did not show plaintiff's condition is disabling.  (Tr. 36).  The agency explained the determination was based
solely on the medical evidence provided by plaintiff because plaintiff "did not take the medical examination" the agency asked
her to have at the agency's expense, an examination which was needed to fully evaluate plaintiff's condition.  The agency noted
plaintiff claimed she is disabled because of attention deficit hyperactivity disorder, dysthemia, bipolar disorder and Asperger's
syndrome.  The agency instructed plaintiff to advise the agency if she decided to attend the special medical examination at the
agency's expense.

the application date.  (Tr. 10).  The ALJ noted plaintiff worked after the established disability onset date but found earnings from this work activity did not rise to the level of substantial gainful activity.

The ALJ found plaintiff has the following severe impairments:  Bipolar Disorder, Anxiety Disorder, Attention Deficit Hyperactivity Disorder (ADHD), and a history of substance abuse now in remission.  The ALJ acknowledged plaintiff was in special education programs during her school years due to emotional disturbances and ADHD, noting she frequently had behavioral issues, confrontations with other students and teachers, and emotional outbursts while at school.  The ALJ also noted plaintiff had a history of sexual assaults, and began treatment with a psychiatrist in 2004 at the age of fifteen, being prescribed Seroquel, Lamictal, and Lexapro (to treat bipolar disorder, depression, and generalized anxiety disorder).  The ALJ noted plaintiff's past use of methamphetamines and marijuana, but acknowledged plaintiff's use of illegal substances appeared to be in sustained remission.

The ALJ determined plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of any of the listed impairments, namely, listings 12.04, 12.06 and 12.09.  The ALJ considered plaintiff's mental impairments under the "paragraph B" criteria of 20 C.F.R. Pt. 404, Subpt. P, App. 1 concerning evaluation of mental disorders.  The ALJ found plaintiff has only mild restrictions in activities of daily living, noting plaintiff can take care of her household chores, cook for herself, do her laundry, and travel out in public by herself via public transportation.  The ALJ found plaintiff has moderate restrictions in social functioning, noting plaintiff socializes with family members, has friends, and seeks out other people when she is feeling most depressed, but has had verbal confrontations with co-workers and other individuals in the past.

The ALJ found plaintiff has moderate difficulties with regard to concentration, persistence or pace, noting plaintiff's testimony that she needs to be reminded to complete certain tasks and prefers help with her shopping to ensure she buys what she needs as opposed to what she wants. The ALJ found plaintiff has not experienced documented episodes of decompensation which are of extended duration. The ALJ determined that as plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not met. The ALJ also considered whether the "paragraph C" criteria were met, finding the evidence failed to establish the presence of the "paragraph C" criteria.

The ALJ, "[a]fter careful consideration of the entire record," found plaintiff has the residual functional capacity (RFC) – the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks – to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple tasks only and work primarily with things rather than people. In making this determination, the ALJ considered all symptoms and the extent to which plaintiff's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 416.929 and SSRs 96-4p and 96-7p. The ALJ also considered opinion evidence in accordance with the requirements of 20 CFR § 416.927 and SSRs 96-2p, 96-5p, 96-6p and 96-3p. (Tr. 11). In considering plaintiff's symptoms, the ALJ noted plaintiff attended public school and, although placed in the special education system due to emotional disturbances and ADHD, scored in the average range of intelligence by her IQ score. (Tr. 12). The ALJ noted Dr. Egerton, a psychologist, examined plaintiff two times during her school years, finding plaintiff's

ADHD to be mild.  The ALJ noted Dr. Egerton's findings in a 2004 examination, when plaintiff was 14-years-old, that although plaintiff "sometimes displayed considerable opposition to certain teachers and became emotionally volatile when she did not get her way," much of her behavior seemed to be "contrived to convince others that what she says is the way things really are."

The ALJ found plaintiff appeared to do best in the subjects, and with teachers, she enjoyed, noting absenteeism, tardiness, lack of participation and poor performance in classes she did not care for and plaintiff's refusal to follow directions of teachers she did not like.  The ALJ noted counselors who examined plaintiff during her school years termed her as manipulative and attention seeking, and felt plaintiff put forth poor effort in school even though she could handle subjects if she liked them.  The ALJ acknowledged plaintiff had conflicts, got angry and sometimes lashed out at fellow students and teachers, eventually quitting 11th grade mid-year but soon obtaining a GED.

The ALJ noted plaintiff's numerous hospitalizations at Northwest Texas Psychiatric Pavilion, including four admissions in the summer of 2007 when plaintiff was 18-years-old, involved with an abusive boyfriend, and was periodically homeless and staying in shelters.  The ALJ indicated plaintiff was treated for severe depression, suicidal ideations, and suicidal gestures. The ALJ noted plaintiff entered treatment with Texas Panhandle MHMR on July 30, 2007 where she received treatment for depression and anxiety.  The ALJ stated that when plaintiff became pregnant in early 2008, and her medications were restricted.  Plaintiff did, however, receive comprehensive prenatal care and was looking forward to being a mother.

The ALJ also referenced a November 5, 2007 mental status examination performed by Dr. Schneider at the request of the state agency.  Although the doctor found plaintiff to be sad and anxious, he further found plaintiff's thought processes were normal and goal directed, thoughts

were cohesive, coherent and organized, and plaintiff's memory and concentration were normal. (Tr. 13). The ALJ noted plaintiff stated she felt comforted by crowds of people but related poorly to Dr. Schneider and his office staff.  The ALJ referenced Dr. Schneider's opinion that plaintiff was a fairly high functioning individual.  The ALJ gave substantial weight to Dr. Schneider's evaluation and his opinions regarding the nature and severity of plaintiff's mental impairments.  The ALJ also found his RFC assessment was supported by plaintiff's past work attempts, including plaintiff's testimony that she looked for other work whenever she left (or lost) a job, that she left her last job because she and her husband had a confrontation at the work place, that she was planning to return but she was not rehired there or at other places she had applied, possibly due to her pregnancy.  The ALJ again referenced plaintiff's ability to secure public transportation and noted she is in the presence of the general public during those times.  The ALJ concluded, "[a]fter careful consideration of the evidence," that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC assessment.  In summary, the ALJ found the evidence supported his conclusion that plaintiff can perform work that requires only simple tasks with one-to-two step instructions, and which requires plaintiff to work primarily with things rather than people.

The ALJ found plaintiff had no past relevant work, finding that although plaintiff had worked at unskilled jobs for several employers, such employment was for very short periods of time (never more than 2 ½ months according to plaintiff). (Tr. 13).  The ALJ noted the work must have lasted long enough for plaintiff to learn to do the job and have been substantial gainful activity.  (Tr. 9).  The ALJ further determined, based on VE testimony, there was other work existing in

significant numbers in the regional and national economies which plaintiff can perform with her RFC, age, and education, *viz.*, unskilled work such as assembler, small products, car wash attendant, and cleaner/housekeeper.  (Tr. 14).  Based on the VE testimony, the ALJ concluded plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and, thus, a finding of "not disabled" was appropriate under the framework of section 204.00 of the Medical-Vocational Guidelines.  "After careful consideration of all the evidence," the ALJ concluded plaintiff had not been under a disability within the meaning of the Social Security Act since June 13, 2007, the date the application was filed.  (Tr. 8, 14).

Plaintiff requested the Appeals Council review the ALJ's decision arguing the ALJ's RFC finding was not supported by substantial evidence.  (Tr. 16-18).  Upon the Appeals Council's denial of plaintiff's request for review on June 9, 2009, the ALJ's determination that plaintiff is not under a disability became the final decision of the Commissioner.  (Tr. 2-4).  Plaintiff now seeks judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

## II.
## STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings and whether any errors of law were made.  *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989).  To determine whether substantial evidence of disability exists, four elements of proof must be weighed:  (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)

(citing *DePaepe v. Richardson*, 464 F.2d 92, 94(5th Cir. 1972)). If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence. *Hames v. Heckler*, 707 F.2d at 164. Stated differently, the level of review is not *de novo*. The fact that the ALJ <u>could</u> have found plaintiff to be disabled is not the issue. The ALJ did not do this, and the case comes to federal court with the issue being limited to whether there was substantial evidence to support the ALJ decision, and whether any errors of law were made.

III.

<u>ISSUES</u>

Plaintiff's brief in support of his complaint presents the following issues for review:

1.      The ALJ's mental RFC finding is not supported by substantial evidence and/or results from reversible legal error; and

2.      The ALJ committed reversible legal error by failing to enter a specific finding on the issue of whether plaintiff can maintain employment for a significant period of time.

IV.

<u>MERITS</u>

The ALJ made the determination that plaintiff is not disabled at Step Five of the five-step sequential analysis. Therefore, this Court is limited to reviewing only whether there is substantial evidence in the record as a whole to support a finding that plaintiff retains the ability to perform

other work that exists in significant numbers in the national economy, and whether the proper legal standards were applied in reaching this decision. After review of the administrative record, the Court is of the opinion substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings, and that no errors of law were made.

A.
Plaintiff's Mental RFC

On March 25, 2003, at the request of plaintiff's school district, Dr. Egerton, a psychologist at the Texas Tech University Health Sciences Center, examined plaintiff to evaluate her "for an ADHD problem." (Tr. 373). With the exception of the Integrated Visual and Auditory Continuous Performance Tests (IVA), all tests were administered by school personnel. Plaintiff was 14-years-old at the time.

Testing revealed plaintiff was functioning in the average range of intelligence. (Tr. 374). No intellectual deficits were detected and learning disabilities did not appear to be impacting her school performance. Results of a parent/teacher-completed behavioral rating scale suggested mild problems with hyperactivity but no serious attentional deficits. The IVA test results also suggested mild attentional problems but no severe deficits. (Tr. 375).

On March 31, 2004, plaintiff and her mother returned to Dr. Egerton's office after plaintiff had gotten into trouble at school for "holding" an illegal substance and, according to plaintiff's mother, would not accept responsibility for her actions. (Tr. 375). The record does not indicate Dr. Egerton examined plaintiff on this occasion, nor does it reveal any other specifics relating to the visit.

On July 22, 2004, Dr. Egerton examined plaintiff at the request of plaintiff's mother who

believed plaintiff was suffering from a form of autism.[6]  (Tr. 375).  Testing was indicative of functioning in the mild to moderate autistic range, however, Dr. Egerton was skeptical of any diagnosis of autism because the diagnosis was made at age 15, and because comments made by plaintiff's teacher's were inconsistent with such a diagnosis.  Specifically, plaintiff's teachers had noted plaintiff's behavior had improved substantially from the previous year, there were minimal problems compared with the previous year's peer interactions, and plaintiff was more focused and compliant with school rules.  Additionally plaintiff's behavior at the July 22, 2004 testing/counseling session was not suggestive of autism.[7]

Dr. Egerton noted plaintiff did display considerable oppositionality, could exhibit emotional volatility when she did not get her way, and that much of her behavior appeared "to be contrived to convince others that what she says is the way things really are."  Dr. Egerton noted problems did not usually develop when plaintiff's comments were taken at face value, noting that only when plaintiff's motives were questioned or if her past indiscretions were pointed out did an "emotional eruption of a considerable magnitude" often follow.  (Tr. 376).  Dr. Egerton noted previous testing was more suggestive of significant behavioral problems than of autism.

All observations, test results, diagnostic impressions and recommendations concerning the above visits were recited in one report dated July 22, 2004.  (Tr. 373-76).  Dr. Egerton indicated diagnostic impressions of disruptive behavior disorder NOS,[8] psychosocial and environmental

---

[6]Dr. Egerton indicated the purpose of the evaluation was also to reevaluate plaintiff's "current attentional status." Presumably this statement applies to the July 22, 2004 examination, however, it is unclear whether such reevaluation was for the school district or for plaintiff's mother.  (Tr. 373).

[7]As an example, Dr. Egerton noted plaintiff walked in his office, made eye contact, smiled and stated, "Guess what I'm in Junior ROTC."  (Tr. 375).

[8]The abbreviation "NOS" indicates "not otherwise specified" and can be used when the mental disorder appears to fall within the larger category but does not meet the criteria of any specific disorder within that category.  *www.BehaveNet.com.*

problems of discord with peers, teachers and parents, and a GAF of 50 indicating "serious difficulty functioning in school and social settings."  As recommendations, Dr. Egerton referred plaintiff to Dr. Veeramachaneni to determine whether medication might help her function more appropriately, rule out underlying depression or Bipolar Disorder, and rule out presence of Asperger's Disorder.

The record indicates Dr. Egerton may have seen plaintiff one other time after 2005, but no records of any such examination are in the official record.[9]

On July 24, 2007, Dr. Egerton completed a Mental Status Report form "using existing records."  (Tr. 377-78).  There is no indication in the report that Dr. Egerton conducted a current clinical examination of plaintiff at or near the time he completed his report.[10]  In his report, Dr. Egerton cited plaintiff's history of mood instability, anger problems, and noncompliance, noted plaintiff's two inpatient hospitalizations (psychiatric) since June 2007, and indicated he did not know what medications plaintiff had been prescribed.  Dr. Egerton noted plaintiff was now homeless, but that her voice and speech, content of thought and thought process had been appropriate; she had been oriented to time, place and person without hallucinations; her moods had been unstable and her affect often dysthymic; she had some notable immaturity; had problems with attention and focus; and had limited insight, poor judgment and was impulsive.  Dr. Egerton cited as his diagnoses a mood disorder NOS and borderline personality disorder, and indicated his prognosis was guarded but noted he had only seen her once since 2005.  In response to an inquiry on the form concerning plaintiff's "[a]bility to respond to change/stress in work settings, " Dr. Egerton opined plaintiff is "limited to very limited" due to anger outbursts when she is stressed.  In response to another inquiry

---

[9]Dr. Egerton's 2007 Mental Status Report indicates he has "seen her only once since 2005," however, the record does not contain any report of a 2005 examination performed by Dr. Egerton. (Tr. 378).

[10]In response to a question on the Mental Status Report form asking the doctor to describe plaintiff's remote, recent, and immediate memory, including her ability to name four presidents or recall three objects, Dr. Egerton simply stated, "Memory is probably intact."  (Tr. 378).

on the form concerning plaintiff's "[a]bility to relate to others and to sustain work," Dr. Egerton

opined plaintiff is "limited to very limited," and indicated plaintiff's "conflicts with others is

notable."  Dr. Egerton opined plaintiff would be able to manage benefit payments in her own

interest.

In his RFC finding, the ALJ found plaintiff could perform the full range of work at all

exertional levels limited to work involving only simple tasks and primarily with things rather than

people.  The ALJ's RFC assessment did not include any specific limitations as to plaintiff's limited

or very limited ability to respond to change or stress in the work setting or to relate to others and

sustain work, nor did the ALJ reference Dr. Egerton's July 2007 report in his decision or include any

explanation as to why the limitations suggested in that report were not included in the RFC

assessment.

By her first ground, plaintiff initially argues Dr. Egerton was a treating source and thus the

ALJ was governed by the higher standards in the regulations concerning the weight which must be

attributed to opinions of treating sources.  Specifically, plaintiff argues that as a treating source, Dr.

Egerton's opinions were to be given controlling weight unless the ALJ specifically considered

certain factors[11] in assessing the alternative weight to be given to Dr. Egerton's opinions.  Plaintiff

contends the ALJ committed reversible error by failing to properly consider Dr. Egerton's July 2007

opinion of plaintiff's limitations under the criteria required for a treating source.

A medical source who provides a claimant with medical treatment or evaluation and who has

---

[11]*Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000) clarifies Social Security Regulations and Rulings by requiring an ALJ
to consider a list of factors when determining that a treating physician's opinion is not entitled to controlling weight.  *Newton*,
209 F.3d at 456.  The factors to be considered are:
| | |
|---|---|
| 1) | the length of treatment; |
| 2) | the frequency of examinations; |
| 3) | the nature and extent of the relationship; |
| 4) | the support provided by other evidence; |
| 5) | the consistency of the opinion with the record; and |
| 6) | the doctor's specialization. |

an ongoing treatment relationship with the claimant is considered a treating source when the claimant has seen the source "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *See* 20 C.F.R. § 416.902. Plaintiff is correct in that the ALJ did not give a reason for not finding Dr. Egerton to be a treating source. However, plaintiff has not demonstrated Dr. Egerton was, in fact, a treating source so as to entitle his opinions to greater weight or to require the heightened standard for rejecting his opinions or attributing less than controlling weight to his opinions. First, plaintiff contends Dr. Egerton's frequency of treatment was "typical for her condition." Plaintiff, however, fails to provide any support for this contention of typicality. The record only shows two examinations of plaintiff by Dr. Egerton over a 4-year period. While the July 22, 2004 one-time combined assessment included recommendations as a result of the "psychiatric referral," there is no indication Dr. Egerton prescribed any type of treatment as a result of either examination or followed up on his recommendations to rule out various causes for plaintiff's problems. In his assessment, Dr. Egerton also referred plaintiff to a medical psychiatrist, Dr. Veeramachaneni, for followup treatment to determine whether medication might help her function more appropriately. The frequency and extent of plaintiff's examination history with Dr. Egerton does not suggest a treating source relationship.

Moreover, the record itself appears to contradict plaintiff's contention that the level and frequency of treatment she had with Dr. Egerton is typical for her condition. The record reflects Dr. Veeramachaneni, the psychiatrist to whom plaintiff was referred by Dr. Egerton, conducted almost monthly appointments with plaintiff from September 2004 through June 2005. (Tr. 345-50). In 2008, when plaintiff underwent outpatient care with the Texas Panhandle Mental Health and Mental Retardation Outpatient Clinic, she was examined on a biweekly basis. (Tr. 309-36). The record

appears to indicate more consistent contact and evaluation to be the more typical method of treating mental conditions such as plaintiff's. Plaintiff's contention that Dr. Egerton was a treating source is not supported to the degree that the ALJ did not have the discretion to make a determination as to whether Dr. Egerton was a treating source or not. Consequently, it was not necessary for the ALJ to afford Dr. Egerton's opinions controlling weight, nor was it necessary for the ALJ to conduct a detailed analysis of the opinions considering each of the *Newton* factors to support any decision not to afford the opinions controlling weight. Any claim that the ALJ reversibly erred by failing to evaluate Dr. Egerton's July 2007 opinion under the *Newton* factors is without merit.

Even considering Dr. Egerton a nontreating physician, plaintiff argues the ALJ erred by failing to properly consider his July 2007 mental status report, noting the ALJ referred to the doctor's earlier evaluation but appears to have ignored the July 2007 report all together. Plaintiff maintains that if the ALJ had considered the report, he would have found such report well supported and would have included the additional limitations in plaintiff's RFC. As a result, the VE would have opined that plaintiff would be precluded from all competitive employment, resulting in a conclusion by the ALJ that plaintiff is disabled.

Defendant concedes the ALJ's opinion does not specifically discuss the July report, but maintains no reversible error resulted from the ALJ's lack of discussion regarding this mental status report. Specifically, defendant argues that even assuming, for the sake of argument, that the ALJ did fail to consider Dr. Egerton's 2007 report, that consideration of the report would not have changed the ALJ's final determination of non-disability.

As noted above, the ALJ specifically addressed Dr. Egerton's 2004 assessments that plaintiff's ADHD was "mild," her tendency to become emotionally volatile when she did not "get her way," and his conclusion that "much of her behavior seems to be contrived to convince others

that what she says is the way things really are." (Tr. 12, 375). The ALJ did not, however, cite or discuss Dr. Egerton's 2007 form Mental Status Report based on existing records and its cited limitations regarding plaintiff's ability to work. Of course there is no evidence that the ALJ did not properly *consider* this report in making his RFC determination. However, it is equally clear that the ALJ's RFC assessment did not *address* the 2007 Mental Status Report. *See* SSR 96-8p. The ALJ's failure to incorporate the additional limitations in Dr. Egerton's 2007 assessment renders his RFC assessment in conflict with an opinion from a medical source. Consequently, the ALJ was required to explain why the 2007 opinion was not adopted. However, the ALJ's error in failing to include such a discussion, in and of itself, does not mandate reversal and remand. Procedural perfection in administrative proceedings is not required and remand is proper only when the substantial rights of the parties have been affected. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Here, plaintiff has not shown the ALJ's failure to discuss the 2007 report and explain his reasons for rejection of the report, while in violation of SSR 96-8p, affected plaintiff's substantial rights.

Based on the state of the record, the Court cannot find the ALJ's decision would have been different had he performed the procedural requirements set forth in SSR 96-8p. After reviewing the record in its entirety, the ALJ accorded substantial weight to the November 2007 consultative opinion of Dr. Schneider, made after an examination of plaintiff, and rendered subsequent to Dr. Egerton's July 2007 report based solely upon existing records. (Tr. 12-13, 433-35). Dr. Schneider noted plaintiff was fully oriented with normal speech, goal-directed thought processes, and normal memory and concentration. (Tr. 434). Moreover, Dr. Schneider noted that, while plaintiff related poorly to him and the office staff during her examination, she indicated she felt comfort in crowds, socialized regularly with family and friends, and attended church once a month. (Tr. 435). Further, as the ALJ noted, plaintiff was pregnant at the time of the hearing, conscientious about receiving

16

prenatal care, and looking forward to being a mother.  (Tr. 12).

In comparison, Dr. Egerton's July 2007 report was based solely upon his existing records with his last examination of plaintiff being in 2004.  The absence of a current clinical examination at the time he rendered his opinion would have justified the ALJ's discrediting the opinion.  *Cf. Perez v. Barnhart*, 415 F.3d 457, 465-66 (5th Cir. 2005) (failure to conduct clinical examination may justify discrediting that opinion).  Moreover, Dr. Egerton did not indicate the basis for his 2007 opinion, nor did he explain the stark differences between his 2004 and 2007 opinions.  Specifically, Dr. Egerton opined in his 2007 report that plaintiff had a limited ability to relate to others, sustain work, or respond to change or stress in work situations even though his previous assessment had noted plaintiff's behavior had improved, with fewer behavioral problems and "minimal problems" with peer interaction compared to prior years.  (Tr. 375).  At the time of her last examination, Dr. Egerton found plaintiff was more focused and compliant with school rules, but tended to become emotional when she did not "get her way."  Dr. Schneider's evaluation, based upon an examination, contradicted and/or discredited Dr. Egerton's assessment of a limited ability to relate to others or cope with stress in work situations.  Moreover, Dr. Egerton's 2007 report was not supported by plaintiff's testimony that she could perform significant social activities, including attending bible study, church, family events, and shelter service events (Tr. 85-87).  Dr. Egerton's assessment was offered nearly two years after his last assessment, with no additional findings, is unsupported by the record as a whole.  The sparse treatment history placed Dr. Egerton in the same classification as Dr. Schneider as a nontreating source.  However, Dr. Egerton's opinion was based on his 2004 examination which was conducted for purposes of evaluating plaintiff's ability to perform in school.  The ALJ chose to accord substantial weight to the more recent, conflicting, clinical evidence offered by Dr. Schneider.  A discussion and probable discrediting of Dr. Egerton's 2007 form report

would not alter the ALJ's decision.  Plaintiff has not demonstrated any discussion of the 2007 form report by the ALJ would have changed his decision or the Commissioner's final determination.  The Court cannot find the ALJ's failure to discuss Dr. Egerton's 2007 opinion affected plaintiff's substantial rights.

Plaintiff also appears to argue the ALJ's RFC finding is not supported by substantial evidence because the ALJ either failed to consider all of the record evidence or elected to "pick and choose" only the evidence that supported his position.  Plaintiff again notes the ALJ's failure to discuss or give weight to Dr. Egerton's July 2007 mental status report.  Plaintiff further notes, however, that the ALJ, while discussing Dr. Egerton's 2003/2004 evaluations, failed to reference (1) plaintiff's referral to Dr. Veeramachaneni for a medication evaluation (which indicated his opinion of a possible severe mental illness), or Dr. Egerton's rating of plaintiff's GAF at 50, indicating "serious difficulty functioning in school and social settings."  Plaintiff also argues that although the ALJ gave substantial weight to Dr. Schneider's November 2007 mental status examination, he noted only two findings from the report, out of four identified by plaintiff, that could be construed as "negative" to the ALJ's finding of non-disability, to wit:  that plaintiff related poorly to Dr. Schneider and his staff, and appeared sad and anxious at the examination.  Plaintiff notes the ALJ failed to reference Dr. Schneider's findings that (1) plaintiff's judgment and insight are limited,[12] and (2) his rating of plaintiff's GAF at 50.  Plaintiff concludes the ALJ apparently only gave substantial weight to those portions of Dr. Schneider's report that supported his ultimate finding of non-disability.

---

[12]In his report of his examination, Dr. Schneider explained his assessment of plaintiff's judgment and insight as limited:

When asked what she should do if she were at the lake and saw a 2-year-old child alone at the end of the dock, she stated, "Look for who's responsible and go get the child."  When asked what she should do if she were the first in a crowded theater to see that a fire had started, she stated, "Scream fire and run."

An ALJ is not required to explicitly discuss all of the evidence he finds supports his decision or that he rejects, nor is an ALJ required to follow formalistic rules of articulation.  *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).  Here, the ALJ averred he considered the complete medical history and all opinion evidence, and more than once averred he carefully considered the entire record/all of the evidence.  While the ALJ may not have transcribed each piece of medical evidence and, indeed, did not specifically list the items from the reports of Egerton and Schneider identified by plaintiff, the ALJ, nonetheless, noted significant evidence supporting plaintiff's claims of disability including numerous hospitalizations, treatment for suicidal ideation, and behavioral problems at school.  Although the ALJ may have failed to reference all of the findings, from the reports, including additional findings that would support his eventual finding of non-disability,  he did not "pick and choose" <u>only</u> evidence that supported his position.

Additionally, although the ALJ did not specifically reference Dr. Egerton's referral to Dr. Veeramachaneni "to determine whether medication might help her function more appropriately," the ALJ did note plaintiff began treatment with Dr. Veeramachaneni in 2004 and was prescribed medication to treat bipolar disorder, depression and generalized anxiety disorder (Tr. 10).  The ALJ also discussed other treatment plaintiff has received for her mental conditions and, in fact, found plaintiff's mental impairments of bipolar disorder, anxiety disorder, and ADHD to be severe impairments.  The ALJ's failure to acknowledge the referral in discussing Dr. Egerton's report does not amount to reversible error requiring a remand.

Moreover, while the ALJ could have referenced the GAF scores of 50 (indicating serious symptoms) assessed by Dr. Egerton and Dr. Schneider in their 2004 and 2007 reports, respectively, he could have also referenced all of the GAF scores from other medical reports contained in the record assessing GAF scores of at least 60 (indicating only moderate symptoms).  The failure to

reference these two ratings, when considered along with the absence of reference to the higher ratings, does not amount to reversible error.  Lastly, while the ALJ did specifically gave controlling weight to Dr. Schneider's report,  which report included the GAF of 50, the undersigned does not find the ALJ's failure to discuss the GAF rating renders his RFC without substantial support.  The bulk, and tenor of, Dr. Schneider's report supports the ALJ's RFC determination and ultimate finding of non-disability and is inconsistent with the GAF rating.  Under these circumstances, the undersigned does not find reversible error with respect to the ALJ's failure to discuss the GAF rating.

The ALJ has the sole responsibility for evaluating a claimant's RFC based on the record as a whole.  *Villa v. Sullivan*, 895 F.2d 1019, 1023-1024; 20 C.F.R. § 416.946.  The determination will stand so long as it is supported by substantial evidence.  In this case, the state agency medical consultant concluded, after examination, that plaintiff had no additional limitations and was a highly functioning individual.  Based on the evidence as a whole, substantial evidence supports the ALJ's finding that plaintiff retains the RFC to perform work at all exertional levels so long as it requires only simple tasks and involves dealing primarily with objects rather than people.  Plaintiff's first ground should be DENIED.

## B.  Consideration of Plaintiff's Ability to Maintain Employment

By her second ground, plaintiff, citing *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986) and its progeny, argues the ALJ committed reversible error by failing to make a separate finding on the issue of whether she can maintain employment for a significant period of time.  Finding plaintiff did not establish the factual predicate required to necessitate a separate finding, plaintiff's ground

should be denied.

In *Singletary*, the claimant, for more than ten (10) years, had led a nomadic existence with sporadic employment in a variety of jobs and considerable amounts of time in various hospitals and mental institutions with numerous diagnoses of mental problems.  *Id.* at 820.  There was substantial objective medical evidence that the claimant had serious, long-term mental impairments, primarily personality disorders.  Even so, the ALJ concluded the claimant was able to engage in substantial gainful activity because he was capable of performing work as he had done in the past.  The Court held, however, that the ALJ failed to consider the extent to which the claimant's condition prevented him from maintaining regular employment.[13]  The Fifth Circuit reversed the ALJ's denial of benefits holding:

> A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time.

*Singletary*, 798 F.2d at 822 (emphasis in original).[14]  The Court noted any determination that a claimant cannot continue working for significant periods of time must be supported by more than a claimant's personal history; it must also be supported by medical evidence.  The Court concluded there was overwhelming evidence to support the claimant's claim that he was unable to hold a job due to his severe mental impairments based on both his personal history and the objective medical

---

[13]The Court analyzed whether the claimant met the general definition of disability under 42 U.S.C. § 423(d)(1)(A) (1082) and 20 C.F.R. § 404.1505(1985) which stated an individual is disabled only when he has a physical or mental impairment which has lasted or can be expected to last for at least 12 months and which is so severe that the claimant is unable to engage in substantial gainful employment.

[14]*Singletary* was subsequently interpreted as holding that a person qualifies as disabled under the Act if he cannot sustain a job for a significant period of time, even if he is sometimes capable of working for "short spurts."  *Frank v. Barnhart*, 34 Fed.Appx. 963 at *2 (5th Cir. 2002).  The Fifth Circuit explained that working in short spurts <u>only</u> did not constitute "substantial gainful activity" and that the claimant therefore might qualify as "disabled."  *Id.*

evidence. *See also Patterson v. Astrue*, 324 Fed.Appx. 419 at *2 (5th Cir. 2009). The Court thus held there was no substantial evidence supporting a determination that the claimant could maintain employment for significant periods of time and remanded the case for reconsideration. *Id.* at 823.

*Singletary* has subsequently been construed to require the ALJ to consider whether an applicant with a serious mental illness remains able to engage in substantial gainful activity when, although he is capable of performing work, he cannot maintain regular employment, and to <u>determine</u> whether the claimant can hold whatever job he finds for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002); *Wagner v. Apfel*, 165 F.3d 23, *1 (5th Cir. 1998); *Leidler v. Sullivan*, 885 F.2d 291, 292-93 (5th Cir. 1989). The Fifth Circuit has clarified, however, that an ALJ need not, in every case, articulate separate and distinct findings that the claimant can perform the incidents of a job *and* that the claimant can maintain the job over a sustained period. *Frank v. Barnhart*, 34 Fed.Appx. 963, *2 (5th Cir. 2002) (claimant did not contend she could only work for short spans of time; instead, she argued she could not work at all). In fact, an explicit finding that the claimant can maintain employment is not required:

> [A]bsent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, <u>or</u> an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of [RFC].

*Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (emphasis added). Moreover, a specific finding is only required in instances where the claimant's impairment remains essentially unchanged over time but waxes and wanes in its manifestations of disabling symptoms. *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003); *see Fraga v. Bowen*, 810 F.2d 1296, 1304 n. 7 (5th Cir. 1987) (in *Singletary*, the claimant's mental impairment remained essentially unchanged over time but waxed and waned in its manifestations). Mere testimony from a claimant of experiencing "good

and bad days" is not sufficient to require a separate "maintenance of employment" determination. *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005).

Here, plaintiff asserts the evidence established the factual predicate necessary to obligate the ALJ to provide a separate finding on her ability to maintain employment. First, plaintiff notes the ALJ found, as relevant, that plaintiff has "severe" mental impairments of bipolar disorder, anxiety disorder, and ADHD. Purportedly as evidence of her inability to maintain employment, plaintiff points to her personal history of seven (7) employers between 2005 and 2007 (when plaintiff was 17-19 years old), the ALJ's finding that plaintiff's jobs were for very short periods of time and did not amount to "past relevant work" under the Act, and her testimony that the longest she ever held a job was "one month to three months." Plaintiff also notes her testimony that she would "work a while, quit or get fired and come back" and her belief that the main reasons for her erratic employment history was her anxiety and co-workers or employers getting frustrated with her and not wanting to deal with her.

As medical evidence that she cannot hold a job due to her mental impairments, plaintiff cites Dr. Egerton's July 24, 2007 opinion that plaintiff's ability "to sustain work" is "limited to very limited," and plaintiff's frequent admittance to inpatient hospital care for treatment of her mental illnesses in 2007 and 2008. Plaintiff also contends the testing, work load and time modifications made for plaintiff in high school are consistent with a post-school inability to maintain employment for a significant period. Plaintiff concludes the evidence thus demonstrated that while she may be capable of finding and performing work, she is not capable of sustaining work for a significant period.[15] Plaintiff also appears to argue her mental impairments wax and wan in their manifestations of disabling symptoms and that the evidence went well beyond mere testimony

---

[15] Plaintiff contends she possibly demonstrates her inability to maintain employment on the grounds of absenteeism alone.

about "good and bad days."  Plaintiff notes her severe mental impairment of bipolar disorder

implies, in its diagnostic definition, a fluctuation in symptom severity and, thus, a fluctuation in

ability to maintain employment.  Plaintiff concludes the evidence established her ability to maintain

employment on a regular and continuing basis is compromised by her severe mental impairments

and that such impairments wax and wan in their manifestation of disabling symptoms.  Therefore,

plaintiff argues a separate determination concerning maintenance of employment (addressing

whether she has the ability to hold a job for a significant period of time) was required and the ALJ's

failure to make such a determination requires this Court to vacate his decision and remand the case

for reconsideration.

Plaintiff also asserts the alternative basis requiring the ALJ to make a separate maintenance

of employment finding, *i.e.*, that the ALJ's decision indicates the ALJ did not appreciate that the

ability to perform work on a regular and continuing basis is inherent in the definition of RFC.

Plaintiff contends the issue was simply not addressed despite the ALJ noting evidence which should

have prompted a separate consideration of her ability to maintain employment.  Plaintiff notes two

of the ALJ's hypothetical questions to the VE included limitations in showing up for, or remaining

at, a job, and that the VE's conclusions were that there would be no competitive jobs that would

allow for either limitation but that the ALJ did not provide any explanation for rejecting such

limitations.  Plaintiff thus concludes the ALJ committed reversible legal error by failing to reach

and state a separate, explicit determination concerning her ability to hold a job for a significant

period of time.

Although the issue is close, no reversible error was committed.  In making his RFC

determination, the ALJ assessed the extent of what he found plaintiff's limitations to be and

explained how the evidence supported his conclusions.  The ALJ narratively discussed the medical

evidence, symptoms and opinions about plaintiff's mental impairments, noting such impairments caused mild to moderate limitations and restricted petitioner to jobs with only simple tasks that involve dealing with objects rather than people. The ALJ also found the objective medical evidence did not support any additional limitations.

The ALJ did not, however, specifically discuss plaintiff's ability to perform work "on a regular and continuing basis." An individual's ability to maintain employment is relevant to a determination of disability. However, as noted above, the Fifth Circuit has made it clear that the ALJ is not required to make a specific and separate finding regarding the claimant's ability to maintain employment in every case. *Frank*, 326 F.3d at 619. Again, a requirement for specific findings requires a situation in which, by its nature, "the claimant's [] ailment waxes and wanes in its manifestation of disabling symptoms." *Id*. Intermittently recurring symptoms from an impairment must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time. *Id.*

Here, while plaintiff stated she has experienced mood changes, the evidence does not establish plaintiff's mental impairments waxed and waned resulting in "periods of incapacity." As noted by the ALJ, counselors and examiners described plaintiff as "manipulative and attention seeking," committing various acts as "gestures" and possibly malingering. Plaintiff's behavior was also described as contrived. Counselors also noted plaintiff was capable of performing in school when she liked the subject and the teacher. By March 2008, plaintiff's mental conditions were described as mild anxiety and improved depression and largely normal mental status findings. (Tr. 228, 233).

The undersigned cannot find, based on the evidence, that plaintiff's mental impairments resulted in intermittently recurring symptoms that prevented plaintiff from keeping a job.

While the clinical definition of bipolar disorder recognizes that persons with the disorder may experience mood shifts from high to low and back again in varying degrees of severity, *see Cline  v. Astrue*, 577 F.Supp.2d 835, 850 (N.D. Tex. 2008), there is no evidence in this record that plaintiff fluctuated between manic and depressive states resulting in fluctuating periods of apparent stability and periods of definite incapacitation.  In fact, plaintiff's testimony appears to question her diagnosis of bi-polar disorder, instead inferring her problems are based on her anxiety in dealing with co-workers.  Plaintiff has not offered any evidence that her condition "waxes and wanes" at all, much less that it "waxes and wanes" in intensity such that her ability to maintain employment was not adequately taken into account in her RFC determination.

Although plaintiff points this Court to our sister court's decision in *Cline*, this district has previously considered another case in which a claimant had a severe mental impairment of bipolar disorder and the ALJ did not make a specific, separate finding as to whether the claimant could hold a job for a significant period of time.  *See Cline v. Astrue*, 577 F.Supp.2d 835 (N.D. Tex. 2008).  In that case, the court noted that by its very nature, plaintiff's bipolar disorder fluctuates between manic and depressive states with periods of apparent stability.  Under the circumstances of that case, the court found the ALJ was required by *Singletary* to specifically determine whether plaintiff could hold whatever job he found for a significant period of time and that failure to do so was legal error.  *See id.* at 848.  The medical record for the claimant in *Cline*, however, reflected bipolar disorder with psychotic features including symptoms such as hallucinations, paranoia, and manic/depressive tendencies.  The level of severity of the mental impairments of the claimant in *Cline* were much greater than in this case.

Moreover, plaintiff has not demonstrated waxing and waning mental impairments have prevented her from maintaining employment as opposed to the changing circumstances of her day

to day life and/or work place situations that resulted in her quitting her jobs or being let go.

Plaintiff's own testimony indicates her ability to maintain employment was, at least in some

instances, unrelated to any mental impairment.  Plaintiff left her last job because of the amount of

gossip, and what she construed as unfair criticism by co-workers, concerning issues of domestic

violence between plaintiff and her then-husband, who had also been employed there.  (Tr. 534-35).

Plaintiff testified that but for her co-workers teasing her, she would have continued at that job and

would have been able to perform that work.  (Tr. 535).  Plaintiff also testified she was not able to

continue a previous job as a shelf stocker, not because of any waxing and waning mental

impairment, but because her employer terminated her employment after she advised them of her

pregnancy.  (Tr. 538).  Plaintiff also advised Dr. Schneider that she had been fired from a job, not

because of severe fluctuating symptoms of her medical impairment, but because of a discrepancy

with money.  (Tr. 434).  Again, plaintiff has not offered evidence that her condition "waxes and

wanes" in intensity such that her ability to maintain employment was not adequately taken into

account in her RFC determination.  Specifically, plaintiff has not presented evidence that her mental

impairments themselves fluctuate to such a degree where, although she is able to secure

employment, she is unable to maintain employment due to the intermittently recurring symptoms

from her mental impairments.  The ALJ did not err by failing to make a separate finding regarding

plaintiff's ability to maintain employment for a significant period of time.

In his decision, the ALJ noted a claimant's RFC is his or her ability to do physical and

mental work activities on a sustained basis despite limitations for his or her impairments.  (Tr. 9).

The ALJ also cited 20 C.F.R. §§ 416.920(e) and 416.945 and SSR 96-8p which make clear that

RFC measures an individual's capacity to perform work "on a regular and continuing basis."  The

ALJ's decision does not indicate the ALJ did not appreciate the regular and continuing basis

necessary for RFC.  The ALJ was not required to espouse a separate and explicit finding concerning plaintiff's ability to hold a job for a significant time on this alternative basis.

Plaintiff also appears to argue the ALJ's inclusion, in various hypotheticals to the VE, of the factor of missing work approximately once a week on an unscheduled, ongoing basis, and his subsequent failure to explain his rejection of such a limitation, indicates the ALJ did not appreciate that the ability to perform work on a regular and continuing basis is inherent in the definition of RFC, thereby requiring a specific maintenance of employment finding.  The ALJ clearly prefaced his hypothetical by noting the origin of this limitation was based on plaintiff's testimony "that due to depression and other issues there might be times where she simply does not feel capable of leaving the home and going to work."  (Tr. 557).  The ALJ ultimately did not find plaintiff was limited to this extent and was not required, based on the evidence as a whole, to include this limitation in plaintiff's RFC assessment.  Nor did the ALJ's inclusion of this limitation in a hypothetical posed to the VE require the ALJ to make a specific and separate finding regarding plaintiff's ability to maintain employment.

Plaintiff's second ground should be DENIED.

The ALJ's decision of non-disability was based on the cumulative medical records plaintiff submitted as evidence of her disability, as well as plaintiff's testimony.  The ALJ's non-disability determination was also based on a comprehensive evaluation of all the relevant evidence supporting or discrediting plaintiff's claims of limitations which resulted in his decision that there was simply insufficient proof that plaintiff could not perform a limited range of all levels of exertional work.  The ALJ's non-disability finding in this case was supported by documented and referenced medical evidence.  There is substantial evidence to support the ALJ's determination that plaintiff has the ability to maintain employment.

V.

RECOMMENDATION

While it is clear this plaintiff has experienced mental problems which potentially affect her ability to work, the evidence of record supports the administrative finding of not disabled.

Therefore, it is the RECOMMENDATION of the undersigned United States Magistrate Judge to the United States District Judge that the decision of the defendant Commissioner be AFFIRMED.

VI.

INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 13th day of September, 2011.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

**\* NOTICE OF RIGHT TO OBJECT \***

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this

report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).